Jones, J.
 

 The defendant building and loan association was incorporated March 2, 1923. Its contract for the sale of stock and memberships was made with the Imperial Finance Company on March 31, 1923. The act relied on by the Attorney General as controlling the activities of building and loan companies generally, including the right to enter into the contract in question, was filed with the secretary of state on April 3, 1923, and became an effective law under our Constitution on July 3, 1923. We attach no importance to the amended agreement of June 8, 1923, since
 
 *323
 
 it only shortens the time which the finance company had, under the original agreement, to sell the stock memberships.
 

 In defense of its right to make such sales under a contract entered into before the effective date of the law thereafter passed, the building and loan company contends (1) that the act, which became effective July 3, 1923, did not apply to an existing building and loan company which had entered into a contract prior thereto, and (2) that such act, if so construed as to apply to such contract, would be retroactive and therefore in violation of Section 28, Art. II, of the state Constitution, and Section 10, Art. I, of the federal Constitution.
 

 The act of 1923 is found in 110 Ohio Laws, at page 62, and amends and supplements prior provisions of the Ohio law relating to building and loan companies. The title of the act reads: “For the better regulation, management and inspection of building and loan associations,” etc. Section 9645, as thus amended, provides that: “No commission or fee shall be paid to any person, association or corporation for selling such stock.” And Section 9649 provides that “no initiation or membership fee shall be charged” for stock issued to members. However, the argument is now being urged that nowhere in the amended act are terms employed showing an intent upon the part of the Legislature to make it applicable to associations which entered into a contract for the sale of its stock and memberships prior to the date of its passage and prior to the date when it became an effective law; that, if there should be any doubt about it, the court should not so con
 
 *324
 
 strue the amended act as to make it retroactive and therefore unconstitutional. In the amended act there appears to be no exception of existing corporations, while its terms are sufficiently comprehensive to embrace all building and loan associations, whether formed before or after the passage of the act. The title of the act covers all associations, while the terms of Sections 9645 and 9649 seem to apply generally to any association, whether existing when the amended act became effective or formed thereafter. The fact that some 17 original sections of the building and loan code, and other sections thereof inconsistent with the provisions of the amended act, are expressly repealed by the latter, furnishes indubitable proof that all such associations were covered by the later act. It is our opinion that the amended act of 1923 was intended to and does apply to building and loan associations then existing, and to the future activities of such associations, including their power to sell stock or memberships therein.
 

 Long before this association was organized, Section 2, Art. XIII, of the Ohio Constitution, provided: “Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed.” When the defendant- obtained its charter, it obtained it subject to the conditions provided in the quoted section of our Constitution. However, we are confronted with the argument that this was an existing contract which the Legislature of Ohio had no right to impair by retroactive law under the provisions of Section 28, Art. II of the state Constitution, which provides: “The general assembly shall have no
 
 *325
 
 power to pass retroactive laws, or laws impairing the obligation of contracts;” and that the amended act likewise violates Section 10, Art. I, of the federal Constitution, which provides that no state shall pass a law impairing the obligation of contracts. The salient features embodied in the contract between the building and loan company and the Imperial Finance Company are that the latter is given the exclusive right to sell the shares and memberships of the former, and is to receive the sum of $4 for each membership sold. The agreement recited that the finance company was to sell 20,000 shares and 20,000 memberships; that no stock was to be sold except accompanied by the sale of a membership. Independent of the Ohio constitutional provision giving the right to the Legislature to alter or repeal corporate law from time to time, undoubtedly the state had the right to supervise and control, in the exercise of its police power, the functions and activities of these corporations created by it. That the state recognized that such powers were necessary is shown by the adoption of what may be denominated as a building and loan code. The various sections of the building and loan act disclose that the franchises obtained by these associations remain under the direct control of the state and its agents; that the inspection and examination of their various activities, and a regulatory power over issuing stock, receiving deposits, borrowing money, and investing funds, are lodged in the state. As is well known, those who become members of such associations by subscribing to stock therein comprise a large number of people, many of whom
 
 *326
 
 are represented by small savings which are often utilized for the purchase or erection of homes. And it was for the purpose of correcting and controlling the probable abuse of power, in respect thereto, that the Legislature entered into the field of regulation.
 

 The contract in question not only gave the exclusive right to the finance company to dispose of 20,'000 shares of the association’s capital stock, but apparently required the finance company to sell 20,000 memberships in connection therewith. The advantage to the finance company and disadvantage to the building and loan company that might accrue are apparent. Naturally the finance company would seek, under its contract, to sell to various subscribers but a single share, while under the constitution and by-laws of the association it would seem that a subscriber could obtain any number of shares for a membership fee of $5. These facts are referred to only for the purpose of confirming the view that these building and loan associations are subject to the exercise of the legislative police power. Although the fact does not appear in the petition, were we to give consideration to the annual report of this association, filed with the department a short time before this suit was brought, this method of contracting for the sale of stock and memberships might result in the serious impairment of its financial standing.
 

 “By virtue of its police power, the state may regulate building and loan associations.
 
 * * *
 
 In the exercise of this power, various statutes have been passed relating, among other things, to the incorporation of such societies, to their pow
 
 *327
 
 ers,” etc. 9 Corpus Juris, 923. Iu this case the state seeks to oust the buildiug and loan company from its claimed right or franchise to sell its stock and memberships in contravention of the statute, after July 3, 1923. It is not our purpose to decide what the effect of this contract may be as between the parties themselves, especially as it has been suggested in argument that this feature has been adjudicated in another case. We are not advised by the record to what extent the contract between the building and loan company and the finance company had been executed by actual sales of stock and memberships prior to the filing of this petition in
 
 quo w&rrcmto.
 
 The petition merely asks for an ouster in the future from the claimed privilege of selling the same in accordance with that agreement. Therefore it is manifest that, while the petition attacks the contract entered into prior to the effective date of the amended act, and asks the judgment of ouster from further proceeding under that contract, it is not sought to impair a completed contractual obligation, but to curtail a subsequent exercise of a franchise by preventing future sales. Undoubtedly this association itself could not enter into such a contract after .July 2, 1923, and, in our opinion, it cannot foreclose the right of the state to exercise thereafter its police power by entering into such contract prior to the date of the amended act.
 

 “A fire insurance company, organized under a special charter before the adoption of the present Constitution, is subject to such reasonable regulations as the Legislature may prescribe by general law, and the public good may require.”
 
 State
 
 
 *328
 

 ex rel.
 
 v.
 
 Eagle
 
 Ins.
 
 Co.,
 
 50 Ohio St. 252, 33 N. E. 1056.
 

 On page 273 (33 N. E. 1060) the opinion quotes Mr. Justice Harlan as saying:
 

 “The right of the plaintiff in error to exist as a corporation, and its authority, in that capacity, to conduct the particular business for which it was created, were granted, subject to the condition that the privileges and franchises conferred upon it should not be abused, or so employed as to defeat the ends for which it was established. * * * Equally implied, in our judgment, is the condition that the corporation shall be subject to such reasonable regulations, in respect to the general conduct of its affairs, as the Legislature may, from time to time, prescribe, which do not materially interfere with or obstruct the substantial enjoyment of the privileges the state has granted, and serve only to secure the ends for which the corporation is created.”
 

 In
 
 Dillingham
 
 v.
 
 McLaughlin,
 
 264 U. S., 370 (44 Sup. Ct. 362), decided this month by the United States Supreme Court, Mr. Justice Holmes said, at page 374:
 

 “We do not agree with the court below as to present contracts. The operation of reasonable laws for the protection of the public cannot be headed off by making contracts reaching into the future.
 
 Manigault
 
 v.
 
 Springs,
 
 199 U. S. 473, 480, 26 Sup. Ct. 127, 50 L. Ed. 274;
 
 Louisville & Nashville R. R. Co.
 
 v.
 
 Mottley,
 
 219 U. S. 467, 482, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671;
 
 Atlantic Coast Line R. R. Co.
 
 v.
 
 Goldsboro,
 
 232 U. S. 548, 558, 34 Sup. Ct. 364, 58 L. Ed. 721;
 
 *329
 

 Denver & Rio Grande R. R. Co.
 
 v.
 
 Denver,
 
 250 U. S. 241, 244, 39 Sup. Ct. 450, 63 L. Ed. 958.”
 

 In
 
 Northern Pacific Ry. Co.
 
 v.
 
 Minnesota,
 
 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630, Mr. Justice Day, delivering the opinion, said at page 596 (28 Sup. Ct. 345):
 

 “There can be no question as to the attitude of this court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one; that it cannot be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts.”
 

 And in
 
 Hudson County Water Co.
 
 v.
 
 McCarter,
 
 209 U. S. 349, 28 Sup. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560, Mr. Justice Holmes, in treating of Article I, Section 10, of the federal Constitution, said at page 357 (28 Sup. Ct. 531):
 

 “One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.”
 

 In conformity with this view we think this principle was sustained in
 
 Louisville & Nashville Rd. Co.
 
 v.
 
 Mottley,
 
 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. There a carrier had issued an annual pass for life for which it had received a substantial consideration. Some years later, Congress, acting under its reserved power of control over interstate commerce, pro
 
 *330
 
 hibited such agreement. The court held that the act of Congress, passed after the annual pass contract was made, rendered the prior contract unenforceable. In the course of the opinion Mr. Justice Harlan said, on pages 482 and 485 (81 Sup. Ct. 270, 271):
 

 “The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time,. Congress might so exert its ,whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable. * * * If the Legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable.”
 

 And to the same effect is the decision announced by the same court in
 
 Union Dry Goods Co.
 
 v.
 
 Georgia Pub. Serv. Corp.,
 
 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420. In that ease the public service company had entered into a private contract with the dry goods company to supply the latter with electric light and power for the period of five years. . About two years after this contract was made, the state, acting through its commission, charged a higher rate. The dry goods company sought to enjoin the action of the commission in charging the higher rate, as the
 
 *331
 
 contract had three years yet to run. In sustaining the action of the commission, that court, at page 375 (39 Sup. Ct. 119'), through Mr. Justice Clarke, quoted the following with approval:
 

 “ ‘It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from properly exercising such powers * * * for the general good of the public, though contracts previously entered into between individuals may thereby be affected.’ ”
 

 And he closes his opinion in the following language:
 

 “These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the State.”
 

 The court is therefore of the opinion that the foregoing provisions of ¡Sections 9645 and 9649, General Code, do not violate the state and federal Constitutions, and that, after July 2, 1923, those sections controlled the functions of building and loan associations with respect to the sale of their stock and memberships. Upon the undisputed facts appearing in the pleadings, a judgment of ouster should be rendered in favor of the relator, as prayed for.
 

 Writ allowed.
 

 Marshall, C. J., Robinson, Matthias and Allen, JJ., concur.
 

 Wanamaker, J., not participating.